**KATTEN MUCHIN ROSENMAN LLP**
Andrew G. Klevorn (Admitted *Pro Hac Vice*)
  andrew.klevorn@kattenlaw.com
Chad J. Doellinger (Admitted *Pro Hac Vice*)
  chad.doellinger@kattenlaw.com
525 West Monroe Street
Chicago, IL 60661-3693
Telephone: 312-902-5200
Facsimile: 312-577-8877

Gloria Franke Shaw (SBN 246390)
  gloria.shaw@kattenlaw.com
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: 310-788-4400
Facsimile: 301-788-4471

Attorneys for Defendant WAL-MART STORES, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| NISHA BROWN and KATHY WILLIAMSON, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WAL-MART STORES, INC., and DOES 1 through 50 INCLUSIVE, <br><br> Defendants. | Case 5:09-cv-03339-EJD <br><br> **[REDACTED]** <br><br> **WAL-MART STORE, INC.'S NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date: July 12, 2018 <br> Time: 9:00am <br> Location: Courtroom 4, 5th Floor <br> Judge: Honorable Edward J. Davila |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ....................................................1

II.    APPLICABLE LEGAL STANDARDS ......................................................................................3

      A.     Summary Judgment Standard ........................................................................................3

      B.     The *Kilby* Framework for Applying the Suitable Seating Order ...............................4

III.   WAL-MART, NOT PLAINTIFFS, IS ENTITLED TO SUMMARY
      JUDGMENT ...............................................................................................................................5

      A.     Consumers Prefer Standing Cashiers to Seated Cashiers. ..........................................6

               1.     The Wholesale Introduction of Seated Cashiers
                   Conflicts with Wal-Mart's Fundamental Operating
                   Principles And Is Customer-Disfavored. ...........................................6

               2.     The Decade-Old Work of Directions Research Is of
                   No Moment. ............................................................................................9

                    a.     The Work of Directions Research Does Not Support
                        the Use of  Seated Cashiers. .................................................10

                    b.     The Research Design of  the Directions Research
                        Reports is Fundamentally Flawed. ........................................12

      B.     Standing Cashiers Are More Productive Than Seated Cashiers. ..............................13

      C.     Providing Seats to All Cashiers Would Be Ergonomically Unsound,
           Leading to Increased Injuries to Cashiers. ................................................................17

               1.     Seated Cashiers are More Susceptible to Injuries Than
                   Standing Cashiers. ...............................................................................17

                 2.     Using Seats for All Cashiers Poses an Increased Risk
                   of Safety Hazards for Wal-Mart Associates and
                   Customers. ...........................................................................................19

      D.     Implementing Seated Cashiers Across All California Wal-Mart
           Stores Has Significant Implications for the Design of The Front-End
           of Wal-Mart Stores. ......................................................................................................20

      E.     Wal-Mart's ADA Policies Are Not A Most-Favored Nations Clause. ...................22

               1.     As a Good Corporate Citizen, Wal-Mart Provides a
                   Small Number of Disabled Cashiers with a Seat as an
                   Accommodation. ..................................................................................22

               2.     The ADA and *Kilby* Have Different Standards. ...............................24

      F.     The Wage Order on Which Plaintiffs Base Their Claim is Not
           Enforceable. ..................................................................................................................25

IV.    CONCLUSION ...................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................4

*Burch v. Coca-Cola Co.*,
   119 F.3d 305 (5th Cir. 1997) ..................................................................................24

*Butler v. Portland Gen. Elec. Co.*,
   748 F.Supp. 783 (D. Or. 1990) .................................................................................9

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..............................................................................................3, 4

*Cripe v. City of San Jose*,
   261 F.3d 877 (9th Cir. 2001) ..................................................................................24

*Dark v. Curry County*,
   451 F. 3d 1078 (9th Cir. 2006) ...............................................................................25

*Garvey v. Kmart Corp.*,
   No. 11-cv-2575, 2012 WL 1231803 (N.D. Cal. Apr. 12, 2012) ...................4, 5, 7, 13

*Gbarabe v. Chevron Corp.*,
   No. 14-cv-00173-SI, 2017 WL 956628 (N.D. Cal. March 13, 2017) .........................9

*House v. Bell*,
   547 U.S. 518 (2006) .................................................................................................4

*Kilby v. CVS Pharmacy, Inc.*,
   63 Cal. 4th 1 (2016) ...................................................................................... *passim*

*Orr v. Bank of America*,
   285 F.3d 764 (9th Cir. 2002) ....................................................................................9

*Sandoval v. Cnty. of Los Angeles*,
   No. LA CV10-03690 JAK (JCGx), 2011 WL 13124127 (C.D. Cal. Nov. 9,
   2011) .........................................................................................................................9

*Senne v. Kansas City Royals Baseball Corp.*,
   315 F.R.D. 523 (N.D. Cal. 2016) ............................................................................10

*Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*,
   515 F.3d 1019 (9th Cir. 2008) ..................................................................................3

**Statutes**

42 U.S.C. § 12112(b)(5)(A) .................................................................................24

42 U.S.C. § 12111(10).........................................................................................24

American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. 42 U.S.C. §1201 ..................... *passim*

Cal. Code Regs. 8 §§ 11040.14(A), 11070.14(A) ..............................................1, 4

Cal. Gov. Code § 12926(u).....................................................................................24

**Other Authorities**

29 C.F.R. § 1630.2(n)(1) ......................................................................................24

Fed. R. Civ. P. 56(a) ..............................................................................................3

Fed. R. Evid. 801-802 ...........................................................................................9

Fed. R. Evid. 803(6) ..............................................................................................9

Sam Walton, <u>Sam Walton: Made in America—My Story</u> 240 (1992) ..........................................2, 6

**NOTICE OF MOTION:**

PLEASE TAKE NOTICE that at 9:00 a.m. on July 12, 2018 in Coutroom 4 of this Court, located at 280 S. 1st Street in San Jose, California, Defendant Wal-Mart Stores, Inc. will move for summary judgment pursuant to Fed. R. Civ. P. 56 on all of Plaintiffs' claims.  The basis for such relief is set forth in the following points and authorities.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' claim is extraordinary. It seeks a radical change in the U.S. retail industry. Virtually every retailer in the United States has long had standing cashiers. The reason for this is plain—standing cashiers are more productive, customers perceive them as providing better service, and they are less prone to injury. Indeed, though the suitable seating order at issue here has been on the books for more than a century, the California Industrial Wage Commission ("IWC") (while it was funded) and its predecessor agencies have not sought to enforce it against the retail industry for nearly a century.

The suitable seating order requires that "[a]ll working employees shall be provided with suitable seats when the nature of the work permits the use of seats." Cal. Code Regs. 8, §§ 11040.14(A), 11070.14(A). Yet the necessary determination is not as simple as Plaintiffs would like to have this Court believe.  *Kilby*, the controlling California Supreme Court case interpreting the order, made plain that the "seating requirement has never been understood as absolute or doctrinaire." *Kilby v. CVS Pharmacy, Inc.*, 63 Cal. 4th 1, 18 (2016). Rather, it is tempered by reasonableness, taking into account the employee's need for a seat balanced against an "employer's considerations of practicability and feasibility." *Id*. In this regard, objective assessment, looking at the totality of circumstances, including the employer's business judgment as to whether a cashier's job functions are best performed standing, rather than seated, must be undertaken.

The following propositions demonstrate that the nature of the work performed by Wal-Mart cashiers in California does not reasonably permit the use of a seat:

- **Customer Service.** Customers have a strong preference for standing cashiers over seated cashiers. In fact, over 75% of customers would select a checkout lane with a standing cashier over one with a seated cashier. These customers preferred standing cashiers because they believed they

would be more efficient, more helpful to customers, and more mobile (and thus better able to scan large items and assist customers in placing items in shopping carts). At Wal-Mart, customer service is foundational: "Everything we've done since we started Wal-Mart has been devoted to this idea that the customer is our boss . . . the customer comes ahead of everything else." Sam Walton, <u>Sam Walton: Made in America—My Story</u> ("<u>Sam Walton</u>") 240 (1992).

- **Efficiency.** Seated cashiers are less efficient in terms of items scanned per hour than standing cashiers. Specifically, based on data from Wal-Mart SWAS reports, seated cashiers process approximately 6.5% fewer items per hour than standing cashiers. Wal-Mart store managers, whose job it is to keep the customer satisfied by providing fast, friendly service, support this conclusion with first-hand observation of and experience with the productivity of seated cashiers;

- **Ergonomics.** Providing all California cashiers with seating would create an ergonomic risk. For example, a seated cashier trying to lift a gallon of milk (which weighs nearly nine pounds) places more stress on his or her shoulder and neck than one who is standing. One would expect an increase in musculoskeletal disorders if cashiers were provided with stools. The use of a seat also creates other unavoidable safety hazards (*e.g.*, tripping over stools) and, without modification of the front-end layout of Wal-Mart stores, is likely to violate other health and safety best practices (*e.g.*, walkway and aisle clearance);

- **Costs.** To accommodate a suitable seat for all cashiers would require Wal-Mart to reconfigure the front-end layout of its stores in California. Any such redesign will result in not only a significant expenditure of capital, but also lost revenue, as lost floor space (due to the reconfiguration) means lost sales and longer wait times for customers in line. In fact, Wal-Mart estimates that converting the front-end of its stores to accommodate seats for all California cashiers could have ███████████████████████████████

    In contrast, Plaintiffs have not provided material evidence to support their claim that Wal-Mart cashiers can reasonably perform their job functions while seated. Rather, Plaintiffs' central arguments on summary judgment—first, that Wal-Mart has conceded a seat is appropriate for all non-disabled cashiers because they provide a very small number of seats to disabled cashiers as an

ADA accommodation; and, second, that customers must not have a preference for standing cashiers because a third-party marketing firm, Directions Research ("DR"), prepared reports in 2007 and 2008 of non-California customers that attempted to assess such preferences—do not and cannot save their claim. Wal-Mart's provision of seats to disabled cashiers is of no moment. Wal-Mart's ADA policies and practices are not a most-favored nations clause to the suitable seating order. What is reasonable with respect to accommodating a disabled cashier is not the same as what is reasonable to accommodate an able-bodied cashier. Plaintiffs' reliance upon the work of DR to show that customers supposedly are indifferent between standing and seating cashiers is equally impotent. Among other things, the work of DR is both stale (conducted over a decade ago) and inapt (as no part of it was conducted in California and did not survey California customers). In any event, the sworn declarations of Wal-Mart store managers, whose job it is to assess the tastes and preferences of customers, confirm that Wal-Mart customers prefer standing cashiers because they generate an atmosphere of fast, friendly customer service. Such everyday observations are the acid test of Plaintiffs' claim, and it fails miserably.

Simply put, providing a seat to all Wal-Mart cashiers in California is not practical, feasible or reasonable. And it directly contradicts the objective business judgment of Wal-Mart—as well as virtually every other retailer—that a cashier's job functions are best performed standing. Wal-Mart therefore respectfully requests that this Court deny Plaintiffs' motion for summary judgment and, instead, grant summary judgment for Wal-Mart.

## II.   APPLICABLE LEGAL STANDARDS

### A.   Summary Judgment Standard

Summary judgment is warranted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of an issue of material fact, but need not produce evidence negating elements of a claim for which the plaintiff bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1029 (9th Cir. 2008). Once the moving party meets its initial burden, the burden shifts to the nonmoving party, who must do more than merely rely on the allegations of

1   its pleadings. *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence . . . will be

2   insufficient; there must be evidence on which the jury could reasonably find for [the nonmoving

3   party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In judging evidence at the

4   summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply

5   determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60

6   (2006). A fact is "material" if it "might affect the outcome of the suit under the governing law,"

7   and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier

8   of fact to decide in favor of the nonmoving party. *Anderson*, 477 U.S. at 248 (1986).

9       **B.**     **The *Kilby* Framework for Applying the Suitable Seating Order.**

10       The suitable seating order requires that "employees shall be provided with suitable seats

11   when the nature of the work permits the use of seats." Cal. Code Regs. 8 §§ 11040.14(A),

12   11070.14(A). The IWC issued the first version of the suitable seating requirement in 1919. *Kilby*,

13   63 Cal. 4th at 11 (2016). The initial version applied only to women and children in the mercantile

14   industry "to cover situations where the work is usually performed in a sitting position with

15   machinery, tools or other equipment." *Garvey v. Kmart Corp.*, No. 11-cv-2575 WHA, 2012 WL

16   1231803, at *2 (N.D. Cal. Apr. 12, 2012). As the years passed, private litigants have attempted to

17   expand the regulation beyond its original purpose to apply to cashiers. *Id.*

18       In *Kilby*, the California Supreme Court provided the relevant factors to be considered in

19   determining whether an employer must provide a seat to employees. Specifically, the Court held

20   that "courts must examine subsets of an employee's total tasks and duties by location . . . and

21   consider whether it is feasible for an employee to perform each set of location-specific tasks while

22   seated." *Kilby*, 63 Cal. 4th at 18. The decision directs courts to perform a "nature of the work"

23   inquiry by "look[ing] to the actual tasks performed, or reasonably expected to be performed, not

24   . . . job titles[] or descriptions that may or may not reflect the actual work performed." *Id* at 18-20.

25       Whether the nature of the work "reasonably permits" the use of a seat "depends on the

26   totality of the circumstances." *Kilby*, 63 Cal. 4th at 19. The totality of the circumstances approach

27   expressly incorporates a "reasonableness standard" that includes "considerations of feasibility." *Id*.

28   Courts are to look to an objective assessment of the employer's "business judgment" taking into

account "an employer's reasonable expectations regarding customer service" as well as "evidence submitted by the parties bearing on an employer's view that an objective job duty is best accomplished standing." *See id.* at 20-21. For example, the *Garvey* court, when considering a similar suitable seating claim against another retailer, emphasized the objective importance of cashier efficiency:

> When customers are in a long line, they too are standing. They are waiting. Their attention is focused on the progress of the line and particularly on the cashier, for it is the cashier whose efficiency signals how long the wait will be. As frustrations mount, the customers may regret that they chose one lane over another. The longer the wait, the more likely customers will become irritated and, next time, will try a competitor's store. [A retailer] has every right to be concerned with the efficiency – and the appearance of efficiency – of its checkout service.

*Garvey*, 2012 WL 6599534, at *13.

The "physical layout of a workspace" must also be considered. *Id.* at 21-22. This analysis is "not an 'engineering' or 'technically-based standard;'" rather, courts are to look to the physical workspace in outlining the expectations of the employer and employee regarding job duties. This, in turn, is critical in assessing "whether providing a seat would unduly interfere with . . . standing tasks, whether the frequency of transition from sitting to standing may interfere with the work, or whether seated work would impact the quality and effectiveness of overall job performance." *Id.* at 20-22.

In sum, *Kilby* established a framework to evaluate the suitable seating rule. As demonstrated below, under this framework the totality of the circumstances reveal that the nature of a Wal-Mart cashier's work does not reasonably permit the use of a seat.

## III.  WAL-MART, NOT PLAINTIFFS, IS ENTITLED TO SUMMARY JUDGMENT

After nearly nine years of litigation, this case has an ample record. Combing through that record vividly demonstrates that it is not reasonable for Wal-Mart to provide seats to all of its able-bodied cashiers because: (a) customers perceive that seated cashiers are less engaged and, as a result, provide diminished customer service; (b) seated cashiers are less efficient than standing cashiers, meaning that, among other things, the wholesale adoption of seats would lead to longer wait times for customers; (c)  standing cashiers are less prone to injury than seated cashiers from both an ergonomic and workplace safety perspective; and (d) providing seats to all able-bodied

cashiers would likely necessitate a reconfiguration of the front-end of Wal-Mart stores (due to the need to provide adequate ingress and egress with the stools in place), which may, in turn, cause Wal-Mart to lose sales (due to lost merchandising space).   These basic propositions mandate summary judgment in favor of Wal-Mart and preclude Plaintiffs' own motion for summary judgment.

### A.   Consumers Prefer Standing Cashiers to Seated Cashiers.

#### 1.   The Wholesale Introduction of Seated Cashiers Conflicts with Wal-Mart's Fundamental Operating Principles And Is Customer-Disfavored.

From its inception, Wal-Mart has been guided by the principle that the customer is paramount.  "Everything we've done since we started Wal-Mart has been devoted to this idea that the customer is our boss . . . the customer comes ahead of everything else." (Wal-Mart's Separate Statement of Facts ("SOF") 1; Sam Walton at 240.) This philosophy is a bedrock principle of Wal-Mart's culture as Sam Walton understood "better than anyone else that no business can exist without customers. He live[d] by this credo, which is to make the customer the centerpiece of all his efforts." (SOF 1; Sam Walton at 220.) It is the satisfied, loyal, repeat customers that are at the heart of Wal-Mart's success "and those customers are loyal to us because our associates treat them better than salespeople in other stores do . . . [S]o, in the whole Wal-Mart scheme of things, the most important contact ever made is between the associate in the store and the customer." (SOF 1; Sam Walton at 164.)

To that end, customer interaction with cashiers is critically important because this is the last touch point for Wal-Mart to exhibit exemplary customer service. (SOF 9; Declaration of Ahmad Razaq (DX 2) ("Razaq") ¶¶ 4-5; Decl. of Ed Pettigrew (DX 3) ("Pettigrew") ¶¶ 3-5; Decl. of Lisa Nicholson (DX 4) ("Nicholson") ¶ 7; Decl. of Robin Feathers (DDX 5) ("Feathers") ¶¶ 6, 9; Decl. of Thaddeus Segura (DX 6) ("Segura") ¶ 5.) Consumers have many options in the retail space, so Wal-Mart differentiates itself by combining everyday low prices with fast and friendly customer service. (SOF 2; see, e.g., DX 5 (Feathers) ¶ 6; DX 4 (Nicholson)  ¶ 7; DX 2 (Razaq) ¶ 3.) This is especially important in today's retail environment, where consumers shop online and are accustomed to instantaneous service at the click of a mouse. Providing seats to all able-bodied

1   cashiers conflicts with these basic principles of the modern retail environment.  As the *Garvey*

2   court noted, each time a seated cashier "were to rise or sit, the adjustment exercise itself would

3   telegraph a message to those in line, namely a message that the convenience of the store and its

4   employees comes first." *Garvey,* 2012 WL 6599534, at *13.  Such a message flies in the face of

5   Wal-Mart's long-standing tradition of exceeding customers' expectations and leaving customers

6   with the best possible impression of Wal-Mart so that those customers come back again.  (SOF 1-2;

7   *see, e.g.,* DX 5 (Feathers) ¶ 6; DX 4 (Nicholson) ¶¶ 6-7.)

8        These concerns are concrete.   Indeed, Wal-Mart store managers across California, whose

9   job it is to be attuned to the tastes and preferences of their customers, attest to the fact that

10   customers would perceive seated cashiers as being less eager and less customer-friendly.  (SOF 8-

11   9; *see, e.g.,* DX 2 (Razaq) ¶¶ 3-5; DX 3 (Pettigrew) ¶¶ 3-5; DX 5 (Feathers) ¶ 6.)   As store

12   managers have related, a seated cashier (with no disability or medical condition) would send the

13   message that the customer is to serve the cashier rather than the other way around.  (SOF 8; *see,*

14   *e.g.,* DX 2 (Razaq) ¶ 5; DX 5 (Feathers) ¶ 6.)

15        A marketing study conducted by Professor Jerry Wind of the Wharton School, an expert

16   that Wal-Mart retained, underscores these real-life, front-line observations—that is, customers have

17   a strong preference for and a better perception of standing cashiers as compared to seated ones.[1]

18   (SOF 4; DX 8 (Wind) ¶¶ 47-54.)   Professor Wind designed and conducted a double blind

19   experiment among a random sample of 1,209 Wal-Mart customers in California. (SOF 3; DX 8

20   (Wind) ¶ 47.) The customers were shown videos—a control video of a standing cashier at Wal-

21   Mart checking out several customers and a test video, which was identical to the control video but

22   the cashier was seated on a stool. (*Id.*) The videos were presented in the context of a supercenter

23   store and a neighborhood store, as well as with male and female cashiers. The customers were then

---

[1] Dr. Wind is the Lauder Professor Emeritus and Professor of Marketing at the Wharton School of the University of Pennsylvania and has vast experience conducting and evaluating marketing and consumer research. He has taught executive development courses on a wide range of marketing topics, consulted extensively for Fortune 500 firms, and regularly contributes to the marketing field, including 25 books, over 300 papers, articles, and monographs, and has served in various editorial roles for prominent marketing journals.  (DX 8 (Decl. of Yoram Wind ("Wind")) ¶¶ 2-7.)

asked a series of questions regarding their perceptions and preferences for standing or seated cashiers. (*Id.*)

The results are striking. For those customers who expressed a preference, *nearly four times as many customers preferred a standing cashier to a seated cashier.*[2] (SOF 4; DX 8 (Wind) ¶¶ 47-54.) Consumers generally preferred standing cashiers because of the perception of improved customer service and efficiency. Specifically, customers stated they prefer standing cashiers to seated cashiers because standing cashiers work more quickly, are more helpful to customers, are better able to scan large items in the cart and put items in the customers' carts, are more engaged with the customer, are more efficient and attentive, and appear more active, alert, professional, friendly and welcoming. (SOF 5-6; DX 8 (Wind) ¶ 48 (figs. 2-5), 52, 55-56.)  Similarly, customers perceive stores with standing cashiers, as compared with seated cashiers, to:

- have a more efficient and faster checkout process;
- value the interaction with me as a customer;
- care about me as a customer;
- treat the products I buy with care; and
- have more friendly cashiers.

(*Id.*)

In addition, if presented with an option, over 75% of customers would select a checkout lane with a standing cashier over one with a seated cashier. (SOF 7.) The comments of survey respondents (all of whom were Wal-Mart customers) reveal the advantages consumers perceive for standing cashiers, including: "I think she'd be faster being on her feet"; "The standing cashier seemed more interested in servicing the customer"; "They can move around better. Looks more efficient"; "Friendlier"; and "Just seems like they care about me as a customer." (SOF 5-6; DX 8 (Wind) ¶ 55.) Likewise, their responses reflect the disadvantages consumers perceive for seated cashiers: "The seated one would seem somewhat lackadaisical"; "Seated cashier looks lazy or lite duty"; and "Standing shows more respect." (SOF 5-6; DX 8 (Wind) ¶ 56.)

---

[2] After being shown both videos and asked a direct comparison question, 40% of Wal-Mart consumers preferred a store with a standing cashier as compared to only 11% who preferred a store with a seated cashier. (SOF 4; DX 8 (Wind) ¶ 53.)

The ability to provide the expected level of customer service, viewed at from an objective perspective, serves as one of the key components under *Kilby* as to whether providing a seat is both reasonable and feasible.  As the foregoing demonstrates, the wholesale adoption of seated cashiers at Wal-Mart stores is not conducive to providing the level of service that customers now expect. Wal-Mart's founding principles, its store managers and Wal-Mart's customers themselves all point in the same direction—that the generalized use of seats by cashiers would lead Wal-Mart to be perceived as less customer friendly.   In a highly competitive retail environment, where other retailers, and most especially online retailers, are not similarly constrained, such a disadvantage cannot be countenanced.  It makes providing seats to all Wal-Mart cashiers unreasonable.

2.   The Decade-Old Work of Directions Research Is of No Moment.

Customer preference is of significant importance to Walmart, and Walmart's California consumers overwhelmingly prefer standing cashiers to seated cashiers. In a futile attempt to undercut this evidence, Plaintiffs rely exclusively on reports prepared by third-party marketing firm DR, issued in 2007 and 2008, which attempt to assess preferences of non-California customers. Plaintiffs contend that these reports conclude that "[t]here is no 'negative perception' of seated cashiers" and that "usage of stools would not have a negative impact on check out speed." (Dkt. 192 at 16-18.)[3] As set forth in detail below, the research methods and design used in the DR reports

---

[3] The documents prepared by DR that Plaintiffs proffer in support of this argument (PX 40 and 44) are inadmissible hearsay. Fed. R. Evid. 801-02. Plaintiffs' motion for summary judgment does not provide any foundation showing that an exception to the hearsay rule applies.  For instance, Plaintiffs have made no showing that the DR reports constitute the business records of DR under Fed. R. Evid. 803(6).  This conclusion is underscored by the fact that Wal-Mart did not adopt any of the work of DR, characterizing it instead as the "opinions" of DR.  (SOF 22; DX 10 (Dep. of Michelle Medlin ("Medlin")) 161:8-18.) Because a court may only consider admissible evidence on a motion for summary judgment (*Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment"), Wal-Mart objects to consideration of the DR documents and moves to strike them. In any event, as set forth below (§A.2.b), the work of DR is the product of a flawed research design. Courts in the Ninth Circuit reject attempts to utilize flawed reports to create a genuine issue of material fact; instead, they disregard such analysis on summary judgment. *Sandoval v. Cnty. of Los Angeles*, No. LA CV10-03690 JAK (JCGx), 2011 WL 13124127, at *2-4 (C.D. Cal. Nov. 9, 2011) (report used to demonstrate inadequacy of deputy training did not create triable issue of fact because it did not establish that incident at issue was the result of insufficient training); *Butler v. Portland Gen. Elec. Co.*, 748 F.Supp. 783, 789-90 (D. Or. 1990) (statistical analysis supporting disparate impact age claim did not create genuine dispute of fact because analysis failed to consider relevant information such as the varying skills of the applicants and skills required for the new positions). *See also Gbarabe v. Chevron Corp.*, No. 14-cv-00173-SI, 2017 WL 956628, at *19-23 (N.D. Cal. March 13, 2017) (striking research report that was based on "unstructured interviews"

are deeply flawed, rendering the reports completely unreliable. The conclusions reached in the reports are not only unsupported by their own research, but are also contradicted by the front-line observations of Wal-Mart's store managers, the work of Professor Wind, and the testimony of Wal-Mart's corporate representative with respect to the work of DR. And no matter what, however Plaintiffs wish to portray the work of DR, they cannot dispute that Wal-Mart has never adopted any recommendation that providing stools to its able-bodied cashiers would not harm its business. Indeed, Wal-Mart's actions, its history, and the real-world testimony of its California store managers demonstrate just the opposite.

a.      **The Work of Directions Research Does Not Support the Use of Seated Cashiers.**

The work of DR consisted of in-store opinion surveys conducted in two phases. The initial phase was conducted in August 2007 at two stores in Neosho, Missouri and Battle Creek, Michigan, respectively. (SOF 10; 2007 Directions Research, Inc. Presentation (DX 9) ("2007 DR") at 3; PX 44 (2008 DR) at 3.) [4] None of DR's work was conducted in California. (SOF 11.) The Neosho store was the "Test" location at which stools were made available for service desk employees, greeters and some cashiers, although not all employees used the stools. (*Id*.) Battle Creek was the "Control" location at which stools were not made available to employees. (*Id*.) The second phase was performed in January 2008. (*Id*.) Three additional Wal-Mart stores were added as test locations in Chandler, Arizona, Bloomington, Minnesota, and Columbia, South Carolina, respectively. (*Id*.) No additional control locations were added to the 2008 phase, with the control location from the previous year being used. (*Id*.)

Besides containing significant methodological flaws, as further set forth below, the work of DR, does not support Plaintiffs' claim that providing seats to Wal-Mart cashiers is reasonable.

---

and a survey that contained leading and suggestive questions); *Senne v. Kansas City Royals Baseball Corp*., 315 F.R.D. 523, 587-91 (N.D. Cal. 2016) (survey included ambiguous questions, suffered from self-interest bias, and made unfounded assumptions).

[4] Wal-Mart submits the 2007 DR Report as DX 9 because Plaintiffs' version filed with their Motion for Summary Judgment omits page 36 (Compare PX40 to DX 9). Notably, this omitted page notes that, by day three of the four day test, "the cashiers think they [the stools] are a nuisance and are pushing them out of the way." SOF 19 DX 9 (2007 DR at 36).

Take, for instance, the assertion that the use of stools will not negatively impact customers' perceptions regarding the quality of Wal-Mart's customer service, which Plaintiffs tout the work of DR as showing. (Dkt. 192 at 18.) Yet, careful examination of the work of DR undermines this claim. For instance, even using its flawed methodology, DR found in its 2007 work that 63% of Wal-Mart customers in the store with standing cashiers had a "very positive" overall perception of Wal-Mart, while only 42% of customers in the store with cashiers using stools had such an impression (SOF 12; DX 9 (2007 Dir. Research) at 8)—a 19% gap that is both statistically significant and, importantly, a key indicator of customer perceptions regarding the use of stools.[5] It demonstrates that introducing stools for cashiers may diminish customer perceptions of Wal-Mart's customer service.  Similarly, though Plaintiffs highlight the supposed finding of DR that customers did not perceive a difference in checkout speed between standing and seated cashiers, they fail to note that Wal-Mart specifically rejected this assertion because the actual data showed a real difference, with customers perceiving seated cashiers as not being as fast overall as standing cashiers. (SOF 20; DX 10 (Medlin) 133:2-134:11, 164:15-165:1; DX 9 (2007 DR) at 11; PX 44 (2008 DR) at DIR00411.)  Such a result hardly generates the level of confidence required to make the fundamental change in business operations and customer relations that a switch from standing to seated cashiers would entail.  And the study took place more than a decade ago, in a very different retail environment that no longer exists.  What customers might or might not have preferred in 2007 or 2008 has no bearing on what customers prefer today.  (SOF 14; DX 8 (Wind) ¶46(c).)

At bottom, the work of DR is, at best, irrelevant. While DR may have had opinions regarding the effects on consumer perceptions or cashier efficiency if cashiers were provided with stools, they are just that—the opinions of DR, not Wal-Mart, and Wal-Mart testified as much. (SOF 22; DX 8 (Wind) ¶¶ 14-46; DX 10 (Medlin) 124:1-124:18, 133:2-134:11, 161:8-163:3.)

---

[5] The 2008 DR report reached a similar conclusion.  Customers who went to a store with a standing cashier were 7% (45% to 38%) more likely to be extremely satisfied than customers who went to a store with seated cashiers. (SOF 13; PX 44 (2008 DR) at 12.)  Given this, Wal-Mart's corporate witness specifically testified that, based upon her review of the work of DR, there was "some impact" to overall customer satisfaction from the introduction of seated cashiers. (SOF 21; DX 10 (Medlin) 166:25-167:1.)

1    Exercising its business judgment, Wal-Mart, one of the most successful retailers in the history of

2    American business, did not adopt the opinions or "findings" of DR.

### b.    The Research Design of the Directions Research Reports is Fundamentally Flawed.

5          Besides not saying what Plaintiffs claim it says, the work of DR also contains serious flaws.

6    Professor Wind examined the work of DR and determined that its design is flawed for numerous

7    reasons, any one of which makes its work inapposite in determining whether providing seats to

8    Wal-Mart cashiers is reasonable under *Kilby*:

9    •    **Stale Results.** The work was undertaken in 2007 and 2008 – *over 10 years ago*. Given the

10   changing consumer attitudes caused by developments in the retail sector since that time, such as the

11   increase in omni-channel retailing (*i.e.*, online, in-store, customer pickup, and home delivery), the

12   reports have little to no explanatory power with respect to *current* consumer perceptions and

13   behavior. (SOF 14; DX 8 (Wind) ¶46(c).)

14   •    **Geographic Disparity.** DR's work is based on a non-random, limited sample that *does not*

15   *include even one California store or customer* and thus, cannot be used to draw any conclusions as

16   to the likely reaction of Wal-Mart consumers in California. (SOF 10; DX 9) (2007 DR) at 3; PX

17   443 (2008 DR) at 3.) Naturally, the demographic composition of California has particular

18   attributes. It is unreasonable to draw inferences about the tastes and preferences of California

19   customers based on the views of customers in Missouri or South Carolina. (SOF 16; DX 8 (Wind)

20   ¶ 19, 46(b); DX 10 (Medlin) 147:15-149:1.)

21   •    **Temporal Discontinuity.** The work of DR was not conducted at the same time.  Some was

22   conducted in 2007 (*e.g.*, the test in Neosho, Missouri in 2007) while other work was conducted in

23   2008.  (SOF 10; DX 9 (2007 DR) at 3; PX 443 (2008 DR) at 3.)  Such a temporal disjunction

24   seriously undermines the reliability of DR's work as well as any ability to draw inferences from it.

25   (SOF 17; DX 8 (Wind) ¶ 16.)

26   •    **Lack of Demonstrated Comparability.**  DR conducted its work across a handful of stores,

27   using one test store (in Missouri) and, ultimately, four control stores (in Michigan, South Carolina,

28   Arizona and Minnesota).  (SOF 10; DX 9 (2007 DR) at 3; PX 44 (2008 DR) at 3; DX 10 (Medlin)

104:6-104:16.)  Yet, there is no explanation as to how these stores were chosen.  Nor is there any information to demonstrate that these stores have similar demographics. Of course, proper research design requires that the test and control groups share similar characteristics, for without such similarity one cannot draw reliable inferences. (SOF 15, 16; DX 8 (Wind) ¶ 17-23, 27, 30; DX 10 (Medlin) 147:15-149:1.) As Wal-Mart's witness commented, the work is flawed because it is not comparing "apples to apples." (SOF 18; DX 10 (Medlin) 147:8-149:1.)

- **Lack of Adequate Controls.** The reports assume, without sufficient support, that the test stores actually had seated employees. In fact, there is no evidence that the cashiers in the test stores consistently used the stools provided to them (if they used them at all). (SOF 19; DX 10 (Medlin) 89:2-95:22 ("[I]t's entirely possible that the cashier wasn't seated the whole time, or just because the stool was there, doesn't mean they used it."); DX 9 (2007 DR) at 36.)  Indeed, the evidence offered suggests that cashiers did not use the seats provided, as the 2007 DR results state that "[c]ashiers think [the stools] are [a] nuisance and are pushing them out of the way."  (SOF 19; DX 9 (2007 DR) at 36.) In fact, according to the results of DR's 2007 work, only one cashier in the Missouri test location had a stool for part of the study. (*Id.*)

In sum, the DR reports contain numerous fatal design flaws, any one of which would render the reports unreliable. The conclusions drawn are not supported by the work itself. The true measure of customer preferences—such as the observations of Wal-Mart store managers, whose job it is to read and understand customer preferences—shows that it is not reasonable to provide seats to all able-bodied cashiers. As such, there is no genuine dispute of material fact as to consumer perception and efficiency of seated cashiers and the Court should disregard the DR reports. The only reliable, admissible evidence before this Court, provided by Wal-Mart, establishes that: (a) customers strongly prefer standing cashiers to seated cashiers (*i.e.*, over 75% of customers prefer standing cashiers to seated cashiers); and (b) store managers understand that customers prefer standing cashiers to seating cashiers.

### B.    Standing Cashiers Are More Productive Than Seated Cashiers.

Cashier productivity is an important component of customer satisfaction with a shopping experience. *See Garvey*, 2012 WL 6599534, at *13 (Because longer lines lead to disgruntled

customers, a retailer "has every right to be concerned with efficiency—and the appearance of efficiency—of its checkout service").   Here, the record evidence plainly demonstrates that providing seats to all of Wal-Mart's cashiers would significantly increase the possibility that cashiers will be less efficient, thereby decreasing customer satisfaction.

Hard data reveals a significant difference in the productivity between seated and standing cashiers.  Using 603 daily associate SWAS reports covering forty-two California stores over the period October 31, 2016 to December 17, 2017,[6] Wal-Mart's expert, Dr. Jeffrey Fernandez—in response to the claim of Plaintiffs' proposed ergonomic expert that seated and standing cashiers are equally efficient—compared the average rate at which seated cashiers processed items versus the average rate of standing cashiers. (SOF 24; DX 12 (Fernandez) ¶ 43.)  He found that standing cashiers, on average, processed approximately 420 items per hour; in contrast, seated cashiers processed approximately 392 items per hour—a 6.5% decrease in productivity compared to standing cashiers. (*Id.*)  This is no small matter.   The cashier is the last touch point between a customer and Wal-Mart.  Just a few moments of additional wait time in line can turn a satisfied customer into a disgruntled one. (SOF 9; DX 2 (Razaq) ¶¶ 4-5; DX 3 (Pettigrew) ¶¶ 3-5; DX 4 (Nicholson) ¶ 7; DX 5 (Feathers) ¶¶ 6, 9; DX 6 (Segura) ¶ 5.)  A 6.5% reduction in cashier efficiency, caused by the introduction of seats for cashiers, is a recipe for just such an outcome.

In addition to statistical data, the nature of cashier work demonstrates why seated cashiers are prone to be less productive than standing cashiers by virtue of the physical tasks actually performed.[7] In fact, in assessing the functions of a cashier for the purpose of developing the job description of a cashier, the following activities were ranked as "critical" to cashier performance:

---

[6] SWAS reports reflect the measurement of the rate at which a cashier scans items.  SWAS reports are generated daily on a store-by-store basis, and each SWAS report lists all cashiers by name for that store with the corresponding hourly rate at which each cashier scans items (what is known as "Items per Hour" or "IPH").  (SOF 23; DX 5 (Feathers) ¶ 5; Decl. of Jeffrey Fernandez (DX 12) ("Fernandez") at Ex. G (SWAS Report Sample).)

[7] To determine whether the nature of cashiers' work reasonably permits the use of a seat, the Court must consider the manner in which cashiers physically perform that work, not job titles or descriptions.  *Kilby*, 63 Cal. 4th at 18. Despite *Kilby*'s mandate that courts review the tasks actually performed by cashiers and not formulaically review a job description, Plaintiffs simply recite a list of nineteen (19) abstract tasks that are associated with a generic job description. (MSJ at 8.) In doing so, Plaintiffs distort the testimony of Jackie Grube, Wal-Mart's Director of Job Design Performance Management and corporate designee, whose deposition testimony addressed the content of the overall job description and not physical tasks actually performed by cashiers. (SOF

- Grasps, turns, and manipulates objects of varying sizes and weights;

- Reaches overhead and below the knees, including bending, twisting, pulling and stooping;

- Assists customers with shopping cart when needed;

- Assists customers with bagging and loading of merchandise;

- Eliminates obstacles in cash register lanes to prevent slip, trip and fall hazards;

- Moves, lifts, carries, and places merchandise and supplies weighing less than or equal to 25 pounds without assistance;

(SOF 28; PX 3 at WM44-45, 47.)[8]  All of these important tasks are made more difficult when a cashier is seated.  In short, it is difficult to "reach overhead and below the knees" or assist a customer with a shopping cart when a cashier is seated.  To perform these tasks, a seated cashier would have to move off and on a stool, which only adds to the time it takes to process transactions while increasing customer wait time.

The real-world observations of Wal-Mart store managers confirm that seated cashiers face greater obstacles in performing their tasks as efficiently as standing cashiers.  As they describe, the tasks regularly and consistently performed by a cashier during the checkout process include stretching for merchandise, lifting and turning to physically move the merchandise, bending to view the bottom of the customer's shopping cart, moving to look inside all merchandise capable of concealing other merchandise, placing merchandise into bags, and turning toward the cash register to process payment. (SOF 29; *see, e.g.,* PX 3 (Profile Report) at WM44-45, WM47; DX 12 (Fernandez) ¶¶ 20, 23-34, 25-27; DX 5 (Feathers) ¶ 6; DX 6 (Segura) ¶¶ 4, 8.) A cashier may need to leave the workstation to use a hand-held scanner if a customer is purchasing merchandise that cannot practically or safely be removed from the customer's shopping cart due to its size and/or weight (*e.g.*, a 20 lb. bag of dog food or a case of water), or if a customer is unable to remove

---

26; DX 13 (Dep. of Jackie Grube ("Grube")), 17:12-25, 22:3-14, 24:7-15, 31:17-33:16, 42:13-45:10, 46:11-47:10, 49:13-19, 49:20-50:2.)

[8] PX 3 is Wal-Mart's Cashier Profile Report, which is the product of a survey of Wal-Mart supervisors and cashiers regarding their assessment of cashier job tasks and their relative importance.  Any activity that received a score of 2.5 or higher (on a scale from zero to three) was deemed to be critical.  (SOF 27; DX 13 (Grube) 12:6-17:25.)

smaller or lighter merchandise from the customer's shopping cart (*e.g.*, if the customer is using an electric cart due to a physical disability). (SOF 30; *see, e.g.,* DX 14 (Williamson) 96:17-103:7, 127:9-19, Declaration of Rhonda Otero (DX 25) ("Otero") ¶¶ 5, 14-15, 23; DX 19 (Liebsch) ¶¶ 12-13, 21, 37; DX 20 (Reindel) ¶ 5; DX 22 (Collins) ¶ 17; DX 23 (Newman) ¶¶ 26.)[9] When not processing transactions, and if no customers are waiting in line, cashiers are required to: (a) redline, which requires the cashiers to leave their workstations, walk around the front-end checkout lanes, look for any customer waiting in another line, and ask if that customer would like to process their purchase at the redlining workstation; (b) zone, which requires cashiers to leave their workstations to arrange and organize merchandise on the shelves located in and around the front-end checkout lanes; (c) ensure that their workstation appears clean and professional, which requires wiping down their workstations, throwing away trash, and possibly processing returned items and merchandise customers decided not to purchase; and (d) restock items needed to perform their jobs, such as register-receipt tape, pens, and shopping bags. (SOF 32; *see, e.g.,* DX 3 (Pettigrew) ¶ 4; DX 21 (Martinez) ¶¶ 6-7; DX 17 (Crecelius) 25:20-26:25.) If a cashier has no customers waiting in line, there are no customers to redline, there is nothing to zone, the workstation is clean, and no items need to be restocked, the cashier has other duties, all of which require physical movement, such as gathering shopping carts from the store parking lot. (*Id.*)

All of this shows the dynamic, active nature of cashiers. They are required to move a lot; as such, it stands to reason that a seated cashier, who would be required to regularly get on and off a chair, would perform his or her tasks less efficiently than a standing one. Less productive cashiers would be detrimental to Wal-Mart's principled approach to customer service. (SOF 33; DX 4 (Nicholson) ¶ 9; DX 6 (Segura) ¶ 5.)

---

[9] Plaintiffs cite to the deposition testimony of John Crecelius, Walmart Senior Director of Innovation, concerning an average percentage of time cashiers spend logged into their cash registers and, from this statistic, inappropriately conclude that cashiers spend the bulk of their time—specifically, 68% —performing the same nineteen tasks behind the register. (Dkt. 192 at 8.) However, the 68% figure says nothing about the tasks that cashiers actually perform; it merely reflects the amount of time cashiers are signed into the cash register. (SOF 31; DX 16 (Martinez Dep.) 48:9-50:16 (not all time logged into the cash register is spent working at a checkstand); DX 22 (Collins) ¶ 29.) A cashier does more than process items over a scanner. (SOF 29-31; *see, e.g.* PX 3 (Profile Report) at WM00044-45, WM00047.)

**C.** **Providing Seats to All Cashiers Would Be Ergonomically Unsound, Leading to Increased Injuries to Cashiers.**

      1.    Seated Cashiers are More Susceptible to Injuries Than Standing Cashiers.

Posture is important.  Proper posture places less stress on the joints and spine, leading to fewer musculoskeletal ("MSD") disorders.  This is one of the reasons why one now observes some workers dispensing with a sitting desk and instead opting for a standing desk.  Requiring all Wal-Mart cashiers to be provided with seats presents similar effects.  By changing the posture in which all Wal-Mart cashiers would perform their job duties from standing to sitting, there are likely to be adverse health consequences for cashiers, most notably the possibility of increased neck, shoulder, arm and back injuries from cashiers stretching to reach merchandise or lift heavy items seated. (SOF 34-35; DX 12 (Fernandez) ¶¶ 26-34; DX 26 (Video Clips of Cashier Movement).)  To take but one simple example, it is much easier, and less stressful on the back and neck, to pick up a gallon of milk (which weighs a little less than nine pounds) while standing than seated.  (SOF 35; DX 12 (Fernandez) ¶¶ 33-34.)  Such repeated and increased stress can take its toll over time.

Dr. Jeffery Fernandez, an ergonomist, has considered the potential ergonomic effects from having all Wal-Mart cashiers perform their job duties in a seated position.[10]  He performed three types of analysis: (a) video analysis (random 10-minute videos of standing and seated cashiers) to assess the type of tasks and activities performed by cashiers, the duration such activities, and ergonomic factors during customer transactions; (b) data analysis of front-end register configurations and work area dimensions at various Wal-Mart stores in California; and (c) biomechanical analysis to simulate three postures (standing, leaning, or sitting) and evaluated each posture to determine the musculoskeletal stresses placed on cashiers when performing common

---

[10]   Dr. Fernandez, PhD, is a Licensed Professional Engineer, a Certified Professional Ergonomist and a Professor in the area of Industrial and Manufacturing Engineering. He is a fellow of the Institute of Ergonomics & Human Factors and a member of the Human Factors and Ergonomics Society. He was the president of the Board of Certification of Professional Ergonomics, the president of the International Society of Occupational Ergonomics and Safety, and the news editor of the International Journal of Industrial Ergonomics. Dr. Fernandez has published more than 200 articles nationally and internationally, and co-authored a textbook on Applied Occupational Ergonomics.  (DX 12 (Decl. of Jeffrey Fernandez ("Fernandez")) ¶¶ 2-5.)

tasks, such as picking up a twelve-pack of beer, which typically weighs a little more fifteen pounds. (SOF 34-36; *see generally* DX 12 (Fernandez) ¶ 8-26.)

Dr. Fernandez's research resulted in the following specific findings, all of which support the conclusion that seated cashiers face increased risks of injury compared to standing cashiers:

- **Foot Movements & Reaches**. Standing cashiers perform several foot movements and arm reaches *per transaction* which: (a) allows them to move closer to handle objects around the workspace (*e.g.*, scanning and bagging items); (b) decreases their need for long reaches and increased elbow, shoulder and back flexion (which would be required in a seated position); and (c) therefore, decreases their exposure to MSDs. (SOF 34; DX 12 (Fernandez) ¶¶ 26-34; DX 26 (Video Clips of Cashier Movements.)  In contrast, a seated cashier performing these tasks would need to reach farther and more frequently, thereby putting more strain on the cashier's arms, neck and back and raising the risk that the cashier will suffer an MSD. (*Id.*)

- **Lifting Heavy Items**. Lifting heavy items (such as, a gallon of milk, beverage cases, or pet food) cannot be performed safely or effectively from a seated position. Biomechanical modeling demonstrates that lifting heavy items from a seated position increases compressive forces in the discs of the spine and puts cashiers at an increased risk of back-related MSDs. (SOF 35.) Specifically, when lifting a 15.2 lb. item (*e.g.*, a pack of beer bottles) in a sitting posture, the compressive forces for a male were 953.19 pound force, which exceeds the 770 pound force limit set by the National Institute for Occupational Safety and Health (NIOSHI). (SOF 35; DX 12 (Ferandez) ¶¶ 19-22.)  Such force substantially increases the risk of back injury. (*Id.*)

- **No Knee Clearance**. Due to the design of the registers, seated cashiers would not have knee clearance. This would require cashiers to sit further back from the registers and cause increased strain to perform required tasks, leading to an increased risk for MSDs. (SOF 36; DX 12 (Fernandez) ¶¶ 19-22; DX 26 (Clips of Cashier Movement.)

In addition to the work of Dr. Fernandez, Wal-Mart store managers observe that scanning items while seated is difficult and could result in injury to cashiers because: (a) it is more difficult to lift and scan many items; (b) the stools do not provide cashiers the range of motion needed to perform their job, such as reaching for items across the belt; and (c) the checkstands do not

comfortably accommodate a stool, making the transition from seated to standing difficult. (SOF 37; *see, e.g.,* DX 2 (Razaq) ¶¶ 4, 6; DX 5 (Feathers) ¶¶ 7, 8.) Further, Wal-Mart has determined that utilizing stools in the current checkstand design would lead to an increased risk of injury to cashiers because, among other reasons, seated cashiers could not safely maneuver within the space behind the register while seated; are more likely to strain their back while lifting large items across the scanner; and would not be able to look within customers' carts as they are required to do. (SOF 38; 30(b)(6) Dep. of Larry Walker (DX 27) ("Walker") 21:19-22:10; DX 17 (Crecelius) 122:1-8.) A manufacturer of checkstands installed at some Wal-Mart stores also advised that its checkstand "is intended for operation by a cashier in a standing position," and that, while it may be used with a stool, on a limited basis, in doing so the "reach range of the cashier will be greatly reduced" and other operational measures, such as additional employees to bag items, "should therefore be employed to . . . help minimize the twisting and reaching motions of the seated cashier."  (SOF 39; DX 28 (Dec. 15, 2006 Royston Checklanes – Ergonomic Review (Gen. Dep. Ex. 16)).)  Such advice provides further credence to Wal-Mart's good faith belief and business judgment.

> ## 2.    Using Seats for All Cashiers Poses an Increased Risk of Safety Hazards for Wal-Mart Associates and Customers.

In addition to increased risk of MSDs for Wal-Mart cashiers, the use of seats by all cashiers creates other safety hazards for both associates and customers. Due to the tightness of the physical space within the cash register area (at most 25.75 x 24.25 inches), placing a stool in the area necessarily presents a tripping or safety hazard for cashiers who are trying to maneuver in the confined space and may need to exit the area to attend to customer needs (*e.g.*, to use the hand-held scanner on large items or assist elderly customers). (SOF 40; DX 12 (Fernandez) ¶¶ 35-38; DX 29 (Clips of Cashier Injury (Assoc. 7) Video and Cashier Injury (Assoc. 14) Video); DX 7 (Williams) ¶ 7.) To accommodate the cashiers' movement, the cash register drawer (which extends 12 inches into the cash register area), and the need to exit the register to assist customers, the stool may be placed outside of the cash register area, perhaps in the neighboring aisle, resulting in tripping and safety hazards for customers or children who may be drawn to climb or play on the stool. (SOF 41; *see, e.g.,* DX 12 (Fernandez) ¶ 35; DX 7 (Williams) ¶¶ 7-8; DX 27 (Walker) 15:22-16:2, 43:1-

43:12.) In fact, there are reported instances of cashiers falling off stools while they are working and instances where cashiers or customers may trip over a stool used by a cashier. (SOF 41; *see, e.g.,* Dep. of Ben Cormack (DX 30) ("Cormack") 38:14-16 ("I've heard that there are instances where people fall off of the stools while they're working. I've heard that there are instances where people may trip over it."); DX 5 (Feathers) ¶ 7 (recounting instance of a customer who fell over a stool because the stool had been pushed out of the checkstand and was partially blocking the aisle).)

Moreover, Wal-Mart has concluded that, if required to provide stools to all cashiers, it would be necessary to take steps to assure that Wal-Mart is exercising reasonable care in its operations (*e.g.,* aisle clearance). (SOF 43; DX 7 (Williams) ¶¶ 2-10; DX 17 (Crecelius) 27:14-30:1 ("We would have to adjust our layout in all facilities to be able to accommodate it.").)  Stools need to be put aside at times because of the nature of the job and because cashiers prefer not to use them. (SOF 19, 40-41.) This presents an unavoidable safety risk of stools blocking aisles and walkways, which could lead to tripping and other accidents as well as an inability to exit quickly in an emergency. (SOF 40-41; *see, e.g.* DX 12 (Fernandez) ¶¶ 35-38; DX 29 (Clips of Cashier Injuries); DX 7 (Williams) ¶ 7.) The only way that Wal-Mart has been able to limit this risk is by limiting the amount of stools provided at a store. (SOF 42; DX 17 (Crecelius) 27:14-29:6; 116:1-17.) If more stools were in use, the safety risk to Wal-Mart associates and customers would significantly increase. (*Id*; DX 17 (Crecelius) 27:14-30:1.)

## D. Implementing Seated Cashiers Across All California Wal-Mart Stores Has Significant Implications for the Design of The Front-End of Wal-Mart Stores.

In addition to the serious customer perception, cashier efficiency, and ergonomic risks of providing seats to cashiers, implementing seated cashiers across all Wal-Mart stores, to the extent it would be possible, would likely necessitate a significant reconfiguration of the front-end of Wal-Mart's stores and cashwraps. This is because introducing an ergonomically designed seat into the existing Wal-Mart cash register area layouts (at best 25.75 x 24.25 inches) produces a number of adverse consequences, including: the cashier would need to move the seat every time the register drawer opens so as not to hit the cashier; there is inadequate room for the cashier to move around, get on and off a seat, or stand in front of the seat to work in a standing posture; a seated cashier

cannot perform all necessary cash register tasks from a fixed position due to reduced functional reach distances; and the constraints of cashiers working in a limited box area would increase the awkward postures of the back, shoulders, neck, and arms, thereby increasing the risk of MSD injuries, as well as other injuries such as trips and falls. (SOF 34-41.)  Moreover, there must be room for the stool to move out of the way of the cashier. (SOF 41; DX 12 (Fernandez) ¶ 35; DX 7 (Williams) ¶¶ 7-8; DX 5 (Feathers) ¶ 7; DX 27 (Walker) 15:22-16:2, 43:1-43:12; DX 30 (Cormack) 38:9-38:16.) This means that frequently the stool may end up in the aisle next to, but behind the cashier, where customers are checking out in the adjacent checkout station.  (*Id*.)  This would present a significant safety issue.  (SOF 41; DX 12 (Fernandez) ¶ 35.)

Given these issues, a redesign of the front-end of each Wal-Mart store in California would be necessary if all cashiers were provided with seats. (SOF 43; DX 7 (Williams)  ¶¶ 2-10; DX 17 (Crecelius) 27:14-30:1.)  Put simply, there would need to be more space between checkouts (approximately two additional feet, so that there is sufficient room for customers to move about in the checkout line while also providing enough room for the adjacent cashier to move his stool).  (*Id*.)[11]  This means there would be fewer checkout lanes, which may impact the number of cashiers employed. (SOF 43-45; DX 7 (Williams) ¶¶ 2-11.)  Likewise, for safety and practicality reasons, there would need to be an area of the store set aside for storage of stools while not in use.  (SOF 43; DX 7 (Williams) ¶ 9; DX 17 (Crecelius) 27:14-30:1.)  Such a storage area would need to be at the front of the store as well, so that cashiers may easily access them and not be forced to walk through the store carrying a stool, which also presents safety risks. (SOF 43; DX 7 (Williams) ¶ 9.)

Such a redesign would impose significant costs upon Wal-Mart.  Not only would Wal-Mart incur the capital cost arising from removing one or more checkout stands from each store, including any remodeling that must be done, but it is also likely to ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[11] Currently, the standard footage between checkout lanes is thirty-six inches (three feet).  (SOF 43; DX 7 (Williams) ¶ 8.)  A standard stool has a diameter of approximately twenty inches. (*Id*.) Thus, when the stool is placed in the aisle (as happens when the adjacent cashier exits his or station to scan an item in a cart or to take a break), the stool takes the majority of the aisle's width. (*Id*.)

1 ████████████████████████████████████████████ (SOF 44; DX 7

2 (Williams) ¶ 10.) ████████████████████████████████

3 ██████████████████████ (*Id.*)   Additionally, fewer checkout lanes

4 would lead to diminished customer service because fewer checkout stations means longer wait

5 times while customers queue to checkout.  (SOF 45; DX 7 (Williams) ¶¶ 10-11.)  Over the long

6 term, dissatisfied customers will turn to other retailers, further leading to lost sales by Wal-Mart.

7      **E.**     **Wal-Mart's ADA Policies Are Not A Most-Favored Nations Clause.**

8      To accommodate cashiers who are disabled or have a medical condition, and in conformity

9 with the ADA, Wal-Mart provides a handful of California cashiers with a stool, which allows them

10 to perform their duties while seated. In total, there have been or are approximately 223 instances in

11 which such an accommodation has been provided out of a total of more than 80,000 class members

12 (or 0.3%).[12]  With this fact in mind, Plaintiffs then engage in a spectacular leap of logic – that is,

13 because Wal-Mart provides stools to a small number of disabled cashiers to conform with the

14 ADA, it must be reasonable for Wal-Mart to provide stools to all of the 80,000 cashiers who

15 comprise the class.  This is absurd.  The ADA is not a most-favored provision that can be grafted

16 on to any workplace rule, such as the suitable seating order.  Put differently, what is reasonable

17 with respect to accommodating a disabled employee or one with a medical condition is not the

18 same as what is reasonable with respect to accommodating an able-bodied employee.  To take but

19 one example, that Wal-Mart permits some of its associates to work with service animals to comply

20 with the ADA, as it does, surely does not mean that it would be reasonable to expect every Wal-

21 Mart associate to be able to bring their pet to work.  But that is the sophistry that underlines

22 Plaintiffs' contention.  It does not comport with either the law or common sense.

23           1.    As a Good Corporate Citizen, Wal-Mart Provides a Small Number of

24                 Disabled Cashiers with a Seat as an Accommodation.

25      Wal-Mart provides a small number of California cashiers with stools not only to comply

26 with state and federal disability laws, but also because it believes that accommodating its disabled

27

28          

[12] The class consists of nearly 80,000 cashiers, and stools were granted to 223 Cashiers over the class period.  (SOF 47; PX 23, 24.)  Thus, Walmart granted stools to less than 0.3% of the class.

cashiers is important to Wal-Mart principles and public policy. (SOF 46; DX 27 (Walker) 26:10-21; DX 30 (Cormack) 36:13-37:1.)  While Wal-Mart recognizes that such cashiers, on average, may not be as productive as a non-disabled cashier, it believes that, as a good corporate citizen, it should provide opportunities for disabled cashiers.  (*Id*.)  In short, Wal-Mart—and its customers—believe that accommodating disabled persons is a good business practice that promotes public policy, notwithstanding that, on average, a cashier that uses a stool is less productive.

The studies conducted by Professor Wind and Dr. Fernandez, as well as evidence from several Wal-Mart store managers, support Walmart's position. As set forth above, seated cashiers are less efficient than standing cashiers, while the vast majority of Wal-Mart customers prefer a checkout lane with a standing cashier—in large part, because a standing cashier will likely work faster than a seated cashier. Nonetheless, customers are also understanding, for if told that the seated cashier is disabled, the preference for a standing cashier diminishes (SOF 48.)  Customers are sensitive to differentiating between disabled and non-disabled associates and they have a much higher perception of disabled seated cashiers than non-disabled seated cashiers.

Further, in contrast to the far-reaching change of providing all cashiers with a seat, the overall system-wide impact of accommodations is minimal.  (SOF 42; DX 17 (Crecelius) 27:14-29:6; 116:1-17.)  Most accommodations for cashiers are granted on a short-term basis because they are due to a temporary condition that prevents them from standing (*e.g.*, pregnancy).  (SOF 49; DX 30 (Cormack) 142:5-18; DX 27 (Walker) 25:16-24.)  In a number of cases, the accommodated cashier is moved to a different position, such as fitting room monitor or to a specific register, during the term of the disability accommodation. (SOF 50; DX 5 (Feathers) ¶ 4; DX 2 (Razaq) ¶ 6; DX 3 (Pettigrew) ¶ 3.) One of the reasons that accommodated cashiers are moved to a different position is because, while seated, cashiers are less efficient, cannot perform all required cashier tasks and present a customer perception issue. (SOF 25, 33, 37; § III.A-B, *supra*.) And the number of such accommodations is minuscule compared to the total number of cashiers—less than 0.3%.

That Wal-Mart chooses to provide such seating accommodations in relatively few instances to comply with disability laws does not present the same level or degree of ergonomic and safety risks that would arise if Wal-Mart were to provide seats to all California Wal-Mart cashiers.  A

single stool in a store presents a limited, contained and easily monitored safety risk, while dozens of stools in a store naturally presents a substantially greater risk of injury to associates and customers.  Accommodations are a matter of scale—providing a stool to a few cashiers may not be disruptive to a business.  But the evidence demonstrates that providing a stool to *all* cashiers would result in decreased customer satisfaction, reduced cashier efficiency, and increased risk of injury.  This is a suitable seating case, not one based on the ADA.   There is no reason to conflate the two.

## 2.   The ADA and *Kilby* Have Different Standards.

Plaintiffs' entire argument regarding the ADA is based on a fundamental legal error—they conflate the ADA's undue hardship standard with *Kilby's* reasonableness standard. The ADA and the suitable seating rule are governed by different standards. The "undue hardship" standard that excuses an employer from providing an accommodation to a disabled employee is different from, and more onerous than, the reasonableness standard for providing all employees with a seat.

Under the ADA, when a requested accommodation would assist a disabled employee to perform the ***essential functions of a job***, the employer must provide it *unless* the employer can show that the accommodation would impose ***an*** "***undue hardship***" on the operation of its business. 42 U.S.C. § 12112(b)(5)(A). This is a fact-intensive inquiry that requires the consideration of such factors such as the nature of the accommodation, its cost, the size of the employer, the type of business, and the number of employees. 42 U.S.C. § 12111(10); *see also* Cal. Gov. Code § 12926(u). Under this analysis for the ADA, it is the burden arising from accommodating a single employee weighed against the entire scope of a business that matters; a small impact arising from a handful of accommodations will generally not rise to the level of an "undue hardship."

Moreover, it is black-letter law that the essential functions of a position do not include ***all*** of the functions of a position. *See* 29 C.F.R. § 1630.2(n)(1); *see also Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001) (not every condition of employment is an essential job function); *cf. Burch v. Coca-Cola Co.*, 119 F.3d 305, 314 (5th Cir. 1997) (obligation to accommodate contemplates changes to employer's procedures, facilities, or performance requirements to permit qualified disabled individual to perform the essential functions; reasonable accommodation will always involve change to the status quo). When accommodating a disabled employee, an employer

may have to restructure a position by eliminating or reassigning some job functions. *See, e.g.*, *Dark v. Curry Cnty.*, 451 F. 3d 1078, 1089 (9th Cir. 2006). This illustrates another key distinction between accommodation, where some aspects of an employee's duties may have to be shifted to another employee, and the purported requirement to provide seats to *all* employees.[13]

In contrast, Plaintiffs' request under the suitable seating rule seeks a far-reaching change to tens of thousands of Wal-Mart cashiers in California. Under it, suitable seating must be provided where the nature of the work *reasonably* permits it; this is a far cry from the ADA standard of requiring an accommodation unless the business would suffer from an undue hardship. That Wal-Mart cannot meet the undue hardship standard of the ADA for a handful of disabled cashiers does not mean that providing seats for all cashiers is reasonable. In fact, as set forth above, the system-wide impact of providing seats to all cashiers would be both material and unreasonable—less productivity, diminished perception amongst customers that Wal-Mart provides good customer service, an increased risk of injuries, and potential lost sales. This damage becomes even more pronounced if Wal-Mart is forced to provide seating to its cashiers while other retailers do not.

**F.      The Wage Order on Which Plaintiffs Base Their Claim is Not Enforceable.**

As a separate and distinct basis on which summary judgment should be granted, and as set forth in Wal-Mart's Motion for Judgment on the Pleadings (Dkt. 226), which is incorporated by reference, Plaintiffs' claim fails because the penalties sought are based on Wal-Mart's alleged violation of an invalid and unenforceable suitable seating order. The regulation, promulgated by the IWC, a now-defunct administrative agency incapable of reevaluating the merits of the suitable seating requirement, deprives Wal-Mart of its constitutional and statutory rights to petition. In addition, the separation of powers envisioned by the California Constitution is offended because no executive official is accountable for the continued existence of the suitable seating requirement, even though the State of California would receive recovery based on this claim and others like it.

**IV.   CONCLUSION**

For the reasons set forth above, Wal-Mart respectfully requests that this Court deny Plaintiffs' motion for summary judgment and, instead, grant summary judgment to Wal-Mart.

---

[13] SOF (39, 46; *see, e.g.*, Walker 26:10-21.)

1    Dated:  May 31, 2018                    Respectfully submitted,

2

3                                             /s/ Andrew G. Klevorn
                                             KATTEN MUCHIN ROSENMAN LLP
4                                            Andrew G. Klevorn (pro hac vice)
                                             andrew.klevorn@kattenlaw.com
5                                            Chad J. Doellinger (pro hac vice)
                                             chad.doellinger@kattenlaw.com
6                                            525 West Monroe Street
                                             Chicago, IL 60661-3693
7                                            Tel: 312-902-5200 / Fax: 312-902-1061

8                                            Gloria Franke Shaw
                                             KATTEN MUCHIN ROSENMAN LLP
9                                            2029 Century Park East, Suite 2600
                                             Los Angeles, CA 90067
10                                           Tel: 310-788-4400/Fax: 301-788-4471

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28